AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Maroon Jeep, VIN 1J4GA64189L768591, License Plate CO Temp 6527986, located at 25306, Road L, Cortez, CO 81321 | )<br>)<br>)  Case No.<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached and incorporated herein.

located in the ___State and___ District of ___Colorado___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute |

The application is based on these facts:

See attached Affidavit incorporated herein

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/ Jacqueline Scott
*Applicant's signature*

Jacquelin Scott, Special Agent, DEA
*Printed name and title*

Sworn to before me and:__ signed in my presence.
  X submitted, attested to, and acknowledged by reliable electronic means

Date: 10/10/2024

*Judge's signature*

City and state: Durango, Colorado    Hon. James M. Candelaria
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT**

I, Jacqueline Scott, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

**PURPOSE OF THIS AFFIDAVIT**

1. This affidavit is submitted in support of a search and seizure warrant for a 2009 maroon Jeep Wrangler VIN: 1J4GA64189L768591 bearing CO TEMP LIC: 6527986, seized pending a search warrant and stored at 25306 Road L, Cortez, Montezuma County, Colorado 81321. Based on my training, experience, and interactions with other law enforcement officers, there is probable cause to believe that evidence relating to violations of Title 18 U.S.C. § 841(a)(1), Possession with Intent to Distribute and Distribution of a Controlled Substance, will be found within the vehicle stored at the following location in Montezuma County, Colorado: 25306 Road L, Cortez, Montezuma County, Colorado 81321

2. The facts set forth in this affidavit are based on my direct participation in the investigation, personal observations, observations of other officers named herein, training, and experience, and information obtained from other witnesses and Law Enforcement Officers, including their incident reports. This affidavit is intended to show that there is sufficient probable cause to search the locations identified herein, as more fully described in Attachment A, incorporated herein by reference, and seize the items of evidence described herein, as further described in Attachment B, incorporated herein by reference. This affidavit does not purport to set forth all of my knowledge of, or the investigation into, this matter. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary and applicable to establish the appropriate foundation of probable cause for the issuance of a

1

search warrant.

3. Based on the below, there is probable cause to believe that items described in Attachment B will be located in the Subject Vehicle, being evidence, fruits, and instrumentalities, and items used in the commission of violations of Title 18 U.S.C. § 841(a)(1), Possession of a Controlled Substance with the Intent to Distribute.

## INTRODUCTION AND AGENT BACKGROUND

4. I, Jacqueline Scott, am a Special Agent (SA) with the Drug Enforcement Administration (DEA), United States Department of Justice, and as such I am empowered under Title 21, United States Code, section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I have been employed as a Special Agent since December 6, 2020. I graduated from the DEA Basic Agent training academy in Quantico, VA on April 22, 2021. This course taught new agents the basic principles necessary to investigate drug trafficking organizations. On June 22, 2021, I was assigned to the Grand Junction, CO DEA Resident Office (GJRO) where I frequently work and assist with local and federal agencies with drug investigations. In April 2023, I became cross-deputized with the Homeland Security Investigations (HSI). Prior to my employment as a Special Agent, I received a Bachelor's Degree in Criminology from the University of South Florida (USF), a Bachelor's Degree in Political Science, and a Master's Degree in Cybercrime. I have participated in the execution of many federal search warrants including those authorizing the search of residences and vehicles relating to drug trafficking operations. I have also participated in the execution of and review of evidence found from the execution of warrants to search electronic devices.

**PROBABLE CAUSE**

5.     The DEA, Montezuma Cortez Narcotics Investigation Team (MCNIT), and Bureau of Indian Affairs (BIA) are investigating Jacob ORTIZ and others for violations of the Subject Offenses. ORTIZ is known to law enforcement as being involved in the sale and distribution of illegal narcotics including methamphetamine and fentanyl. ORTIZ is also known to be involved in the sale of firearms. MCNIT and BIA have conducted multiple controlled purchases from ORTIZ using a confidential information ("CI"). On December 13, 2022, MCNIT and BIA conducted a controlled purchase of 101 grams of methamphetamine from Jacob ORTIZ utilizing a MCNIT CI at 925 Mesa Lane, Towaoc, CO 81334. The price of the methamphetamine was negotiated to be $1050.00. Prior to conducting the controlled purchase, the CI met with law enforcement to be briefed on the operation. The CI was paid for their assistance with this operation and was not working off charges. The CI and the CI's vehicle were searched and no narcotics, weapons, or contraband were found. The CI was equipped with an audio-visual recording device and the $1050.00 official advanced funds for this controlled purchase. Prior to the controlled purchase, and in the presence of law enforcement, the CI made a recorded call to ORTIZ to coordinate the meeting location for the controlled purchase of methamphetamine. During the controlled purchase, on the audio-visual recording device, one vacuumed sealed plastic bag containing a crystal-like substance was observed. On video, the CI and ORTIZ were seen and heard moving the deal from inside the residence to the CI's vehicle. While in the vehicle, ORTIZ was observed on video providing the CI with multiple vacuumed sealed plastic bags containing a crystal-like substance. On video, ORTIZ is seen and heard counting the official advanced funds that was provided to the CI by law enforcement. After the drug transaction was

completed, ORTIZ is heard on video offering to provide the CI with 2 handguns for $200.00 each. After the controlled purchase, the CI met with law enforcement and provided detectives with the suspected methamphetamine in the packaging ORTIZ handed to the CI on video. The methamphetamine was transported to the Montezuma County Sherriff's Office to be processed per MCNIT's policies and procedures. While at the Montezuma County Sheriff's Office, the purchased methamphetamine was tested with TruNarc Narcotics Analyzer and was found to be presumptive positive for methamphetamine.

6.      On January 5, 2023, MCNIT and BIA conducted a controlled purchase of approximately 109 grams of methamphetamine for $1,200.00 from ORTIZ utilizing a MCNIT CI at 925 Mesa Lane, Towaoc, CO 81334. Prior to conducting the controlled purchase, the CI met with law enforcement to be briefed on the operation. The CI was paid for their assistance with this operation and was not working off charges. The CI and the CI's vehicle were searched and no narcotics, weapons, or contraband were found. The CI was equipped with an audio-visual recording device and the official advanced funds for this controlled purchase. Prior to the controlled purchase, and in the presence of law enforcement, the CI made a recorded call to ORTIZ to coordinate the meeting location for the controlled purchase of methamphetamine. During the controlled purchase, on the audio-visual recording device, the CI is seen and heard contacting ORTIZ. ORTIZ is also seen on video handing the CI a vacuumed sealed plastic bag that contained a crystal-like substance. ORTIZ is seen on video counting the official advance funds that was provided to the CI by law enforcement. After the controlled purchase, the CI met with law enforcement and provided detectives with the suspected methamphetamine, which was consistent with the package that ORTIZ handed to the CI on video. The one vacuumed sealed

4

bag of methamphetamine was transported to the Montezuma County Sherriff's Office to be processed per MCNIT's policies and procedures. While at the Montezuma County Sheriff's Office, the purchased methamphetamine was tested with TruNarc Narcotics Analyzer and was found to be presumptive positive for methamphetamine.

7. On January 7, 2023, MCNIT and BIA conducted a controlled purchase of approximately 214 grams of methamphetamine and 13 counterfeit "Oxy30" fentanyl pills from ORTIZ utilizing a MCNIT CI at 925 Mesa Lane, Towaoc, CO 81334. The price of the methamphetamine was negotiated to be $2,200.00 and the counterfeit fentanyl pills were negotiated to be $100.00. Prior to conducting the controlled purchase, the CI met with law enforcement to be briefed on the operation. The CI was paid for their assistance with this operation and was not working off charges. The CI and the CI vehicle were searched and no narcotics, weapons, or contraband were found. The CI was equipped with an audio-visual recording device and the official advance funds for this controlled purchase. Prior to the controlled purchase, and in the presence of law enforcement, the CI made a recorded call to ORTIZ to coordinate the meeting location for the controlled purchase of methamphetamine. During the controlled purchase, on the audio-visual recording device, the CI is seen and heard contacting ORTIZ. ORTIZ is also seen and heard on video counting the official advance funds that was provided to the CI by law enforcement. After the controlled purchase, the CI met with law enforcement and provided the suspected methamphetamine and suspected fentanyl to law enforcement. The methamphetamine and counterfeit fentanyl pills were transported to the Montezuma County Sherriff's Office to be processed per MCNIT's policies and procedures. While at the Montezuma County Sheriff's Office, the purchased methamphetamine was tested with TruNarc Narcotics Analyzer and was

found to be presumptive positive for methamphetamine. The pills, which were consistent with the appearance of counterfeit fentanyl pills, were not tested at this time.

8. On September 15, 2024, Your Affiant was notified of an overdose incident that occurred at 14071 Road 37, Mancos, Colorado 81328 on that day. Montezuma County Sheriff's Deputies first responded and identified four victims of this incident: Michael Morelli, Ricky Garcia (Smith), Charilyn Thomas, and Quintana Blueeyes. Deputies found Blueeyes deceased at the 14071 Road 37 address, while Michael Morelli, Ricky Garcia (Smith), and Charilyn Thomas were transported to several regional hospitals for narcotics overdose.

9. Detective Hakan Aybar with the Montezuma County Sheriff's Office also responded to the 14071 Road 37 address with the Deputies. At the time Detective Aybar responded, EMS had transported the surviving victims of the overdose to medical facilities. Detective Aybar remained on scene with the Montezuma Coroner with the deceased victim. Montezuma County Coroner later advised that the signs of death for Blueeyes were indicative of a fentanyl overdose, as a fentanyl synthetic opiate. Blueeyes' toxicology report, which was completed on September 30, 2024, showed multiple drugs in her system, including but not limited to, Xylazine, Acetyl Fentanyl, MDMA, Methamphetamine, and Cannabinoids. Detective Aybar spoke with a third party who was at the residence during the overdose investigation. The witness advised Aybar that fentanyl was involved. While inside the house, Montezuma County Sheriff's Deputies and Detective Aybar observed, in plain sight, paraphernalia throughout the home consistent with the use of fentanyl based on their training and experience. Additionally, according to Deputies, medical personnel informed Deputies that they had to use a large quantity of NARCAN to medically stabilize the surviving victims. Based on Your Affiant's training and experience, Your Affiant knows NARCAN to be used to counteract the effects of an opiate during an overdose

episode.

10. On September 15, 2024, Victor Galarza, a Task Force Officer (TFO) with the DEA contacted the family of the deceased victim, Blueeyes. The sister of Blueeyes provided TFO Galarza with a Facebook message that Jacob Ortiz sent to her on September 15, 2024. Jacob Ortiz stated in part, "Idk I showed up to Morelis and found her Moreli ricki and char dead idk what happened but I'm going to find out and handle it…". The sister advised TFO Galarza that Blueeyes lived at the 14071 Road 37 address with Jacob Ortiz. Additionally, the sister said Ortiz told her that he, Ortiz, left the residence with two of Blueeyes' children before medics and law enforcement arrived. NOTE: Blueeyes had three children. Law enforcement later located the third child.

11. On September 16, 2024, Special Agent Lyle Benally with BIA and TFO Galarza interviewed Ricky Garcia (Smith) at Southwest Memorial Hospital in Cortez, Colorado. Garcia (Smith) was recovering at the Hospital from her suspected overdose of fentanyl. Garcia (Smith) explained that Michael Morelli was the individual who provided her and the other individuals with a small hard plastic container that contained a large quantity of what Ricky Garcia (Smith) originally suspected to be cocaine. Garcia (Smith) described the substance as white powder and that there was a "rock", like a compacted powder of the same substance, inside the container. According to Garcia (Smith), Morelli retrieved the container with the substance from the attached garage and/or one of the other rooms. Garcia (Smith), later added that one of the rooms could have been Jacob Ortiz's room. Garcia (Smith) told TFO Galarza that Jacob Ortiz's room may be a large room with a connecting bathroom on the second story of the residence. Garcia (Smith) further informed TFO Galarza that as soon as she "snorted" the illegal substance she knew it was

not cocaine because her face did not go "numb" and it didn't taste like cocaine. Garcia (Smith) later added, that there were five children in the home when the overdose incident occurred: one was Morelli's child that lived there, one was Thomas', and three belonged to Blueeyes. Garcia (Smith) told TFO Galarza that a few days prior, on Wednesday September 11, 2024, she witnessed Jacob Ortiz supplying counterfeit "Oxy30" fentanyl pills to Morelli. Garcia (Smith) advised she knew they were counterfeit based on her prior experience using fentanyl. She continued to explain that she also witnessed Jacob Ortiz providing Morelli with methamphetamine on the same date, Wednesday, September 11, 2024. During the interview, TFO Galarza asked Garcia (Smith) whether she knew of Jacob Ortiz's possession or sale of firearms. Garcia (Smith) informed TFO Galarza, she did. Garcia (Smith) stated that Jacob Ortiz asked her approximately several weeks ago if she knew someone interested in purchasing firearms from him. NOTE: This would have occurred in 2024.

12. Through this investigation, TFO Galarza discovered 14071 Road 37, Mancos, CO 81328, is owned by Jimmy C. and Norma J. Atkison. Jimmy and Norma are the parents of Michael Morelli.

13. Detectives from Montezuma County gathered information from a number of sources indicating that multiple unknown individuals, along with Jacob Ortiz, had been at the 14071 Road 37 address in the hours immediately following the overdose. From several of these sources it appears as though Jacob Ortiz took children from the scene of the overdose and transported them away from the scene. It appears that Jacob Ortiz was associated with a white Chevrolet truck. Additionally, it is known that Charilyn Thomas is the owner of a 2009 maroon Jeep Wrangler bearing CO LIC: 6527986. Detectives located the above-mentioned Jeep Wrangler at the P & D

Grocery store located at 280 Hwy 160 E. Frontage Road Unit 5, Mancos, Colorado on September 16, 2024. A brief review of the surveillance footage from the grocery store shows a white truck, driven by Jacob Ortiz, arrive at the grocery store at approximately 0407 hours on September 15, 2024. Children can be observed in the white Chevrolet. Shortly after the white Chevrolet arrived a female parks the above-mentioned Jeep at the grocery store and exits the vehicle. The female is observed in the video to be blonde wearing a dark colored hooded sweatshirt. Investigators believes that the women who was driving the Jeep was Kyra Goodall. Goodall has been mentioned in interviews throughout this investigation as a person who frequented Morelli's residence. Morelli told Your Affiant during an interview on September 19, 2024, that Goodall was in a romantic relationship with Ortiz. The Jeep was ultimately sealed and towed from the grocery store pending a search warrant.

14.     On September, 16 2024, Detective Aybar, with the Montezuma County Sheriff's Office, spoke with Marilyn Haun, Charilyn's mother. Marilyn informed Detective Aybar that she had reason to believe that a female from Mancos had abandoned the Jeep at the P & D grocery store. She further advised she went to check on the vehicle at the P & D and in so doing observed a black box and a syringe in the front passenger seat. Marilyn advised this Kyra person dropped off Charilyn's daughter to her, Marilyn, at Marilyn's residence.

15.     Based upon the information gathered to this point it appears as though the Jeep Wrangler mentioned above, which belongs to Charilyn, likely travelled from the scene of the overdose or at a minimum met with Jacob Ortiz after the overdose occurred. Further, Marilyn checked on the vehicle on September 16, 2024, and observed items, including a black box and a syringe, which are, based upon the training and experience of your Affiant, consistent with drug paraphernalia.

From training and experience I know that syringes are commonly used for the purpose of injecting illegal substances and frequently individuals who use and transport illegal substances will utilize all manner of containers to hold their quantities of drugs and assorted paraphernalia. Detective Aybar has confirmed that he has also observed a syringe and black box in plain view in the Jeep. Given the sequence of events described above Your Affiant believes it likely that items associated with the overdose are to be found within the Jeep, especially considering the Jeep was possibly removed from the scene of the overdose and appears to contain drug paraphernalia.

16.   On September 18, 2024, Your Affiant, along with HSI SA Douglas Perhacs, interview Charilyn Thomas at the Intermountain Health Saint Mary's Regional Hospital. Thomas reported that that the day of the overdose, she remembered that there were no drugs at Morelli's residence and the people that were at Morelli's home were looking for drugs. Thomas reported that Ricky Garcia (Smith), Michael Morelli, Quintina Blueeyes, Jacob Ortiz, and herself were at the residence looking for drugs. Thomas recalled that Ortiz said that someone was coming by to bring drugs. Thomas did not recall anyone else being at Morelli's residence that day. However, Thomas said Clancy Comiksy, Charles Alberts, Ted Shields, and Kyra Goodall would come by to Morelli's residence frequently on other days. Thomas stated that she was staying at Morelli's for a month or two because Thomas' mother kicked her out of Thomas' mother's residence.

17.   At this time your affiant and investigators believe that the Jeep was likely at the scene of the overdose incident because Thomas resided there, the Jeep belonged to another person who was also there and overdosed, the Jeep was moved very early in the morning, and then the Jeep was abandoned. Your affiant believes that the Jeep was driven from the scene of the overdoes incident on the day of the overdoses. Given that the Jeep was likely driven from the scene,

confirming the identification of the driver is pertinent as the driver is likely a witness to some if not all events of this incident. Additionally, as the suspected driver was/is in a romantic relationship with Ortiz and appears to have met with him at the point the Jeep was abandoned, the driver likely was told information regarding the overdoses. Finally, the Jeep was abandoned demonstrating a motive to distance oneself from an item that was used or has evidence of criminal activity. Your Affiant believes it likely that the Jeep will contain evidence of the identity of the driver, such as fingerprints and DNA, personal items such as cell phones which also contain evidence of identity and communications with others involved, and drug paraphernalia.

## MODUS OPERANDI OF DRUG TRAFFICKERS

18.     Based on my training and experience, I know that persons who distribute drugs use miscellaneous written documents such as published books and magazines concerning drug manufacturing and sales, written records concerning the perpetrator's distribution activities, account ledgers dealing with profits and losses associated with growing and distributing drugs, distribution schedules, documents concerning profitability, and other such documents and written records. These written records and documents are normally discovered during the execution of a search warrant upon the residence or location, the premises owned or controlled by the distributor, upon their persons, or within vehicles they use, and are of evidentiary value. I also know that traffickers often use wire transfers, cashier's checks, and money orders to pay for controlled substances or transfer proceeds. Evidence of such financial transactions and records relating to income and expenditures in connection with drug trafficking are typically maintained and found upon the premises owned or controlled by the traffickers, upon their persons, or within vehicles they use, and are of evidentiary value. During investigations of drug distribution to include but not limited to

11

methamphetamine, fentanyl, cocaine, and heroin, agents have found written documents, including, but not limited to, pay-owe sheets, lists of phone numbers (including numbers of potential co-conspirators), records of drug distribution, lists of associates (including names of potential co-conspirators), and identification documents such as driver's licenses, state identification cards, credit cards, school identification, social security cards, and voter registration cards.

19. Based on Your Affiant's training and experience, I know drug traffickers typically possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might want to forcibly take the traffickers' profits and/or supply of drugs.

20. Based upon training and experience, Your Affiant is aware that individuals present for or directly involved in drug overdoses, especially those individuals who may have had involvement in the distribution of the drugs associated to the overdose are strongly motivated to avoid detection by law enforcement and frequently go so far as to not call for medical assistance for victims, flee the scene, tamper with or remove witnesses, and remove items of evidence such as drugs and paraphernalia. Your Affiant is aware that such removed evidence is susceptible to placement elsewhere for the purpose of hiding the evidence, making it available for future sale, or simply to disassociate it from the distributor.

21. Based upon training and experience, Your Affiant is aware that individuals who distribute drugs often conceal their drugs and drug related items in closed containers in a way to evade law enforcement from locating the drugs or drugs related items. Your Affiant knows that containers of all sizes and labeling can be used to contain drugs and drug related items. Your Affiant knows that it is common for someone who has been selling drugs for a long time to conceal drugs and

drug related items very well in their vehicle, residence, or person.

22. Based upon training and experience, Your Affiant is aware that it is common practice amongst those involved in the drug distribution culture to possess and utilize multiple cellular devices or mobile devices capable of accessing social media and messaging services. Those involved in the distribution of drugs frequently dispose of, hide, or transfer these devices as a method to thwart law enforcement.

23. Based upon training and experience, Your Affiant knows people who distribute drugs, often use filler or "cutting" agents in drugs to make the quantity of drugs they can sell larger. For example, Your Affiant knows that acetaminophen is a common filler agent for counterfeit fentanyl pills and that it is common for counterfeit fentanyl pills to test for acetaminophen. Your Affiant knows that there are other filler agents that are commonly used to make drug quantities larger such as alcohols, chemicals, and powders. Based on training and experience, Your Affiant is aware that individuals often leave photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film, slides, in particular, photographs of co-conspirators, of assets and/or controlled computers, cellular telephones and/or portable telephones, pagers, iPods, and similar electronic devices in their vehicle. Your Affiant knows that individuals often times travel with some of the above-mentioned items and know that information such as photos, videos, audio recordings, messages, and information pertaining to this case could be stored on the above-mentioned items. Information stored on these devices could help identify who was driving and who was present in the vehicle around the day of the overdose incident.

24. My awareness of these drug trafficking practices, as well as my knowledge of drug manufacturing and distribution techniques as outlined in this Affidavit, arise from the following:

  a. my training in controlled substance investigations;

  b. my past experience in the investigation of multiple drug distribution operations;

  c. the experience of other officers and agents who have trained and advised me; and

  d. other information provided through law enforcement channels such as databases.

## **SEIZURE AND SEARCH OF ELECTRONIC DEVICES**

25. If electronic devices are collected as identified below, Your Affiant will seek a separate search warrant to search the content of the respective devices.

## **CONCLUSION**

26. Based on the foregoing facts and information, my training and experience, and through discussions with other investigators, I believe there is probable cause to find that the location described in Attachment A, attached hereto and incorporated herein by reference, will contain the items set forth in Attachment B, and probable cause exists to search the locations described in Attachment A for the items described in Attachment B. These items constitute evidence of the commission of criminal offenses and are contraband, fruits of the crime, things otherwise criminally possessed, and property designed or intended for use, or that is or has been used, as the means of committing the criminal offenses of Title 21, United States Code, Sections 841(a)(1), Possession with Intent to Distribute a Controlled Substance.

/

/

/

I, Jacqueline Scott, Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted: s/ *Jacqueline Scott*
Special Agent, Drug Enforcement Administration

Subscribed, attested to, and acknowledged by reliable electronic means on October 10, 2024.

Hon. James M. Candelaria
UNITED STATES MAGISTRATE JUDGE

The affidavit was reviewed and is submitted by AUSA Riley Josh Player on October 10, 2024.

15

# ATTACHMENT A
## Description of Location to be Searched





Location:
25306 Road L
Cortez, CO 81321

Description of Vehicle:
Owner – Charilyn Thomas DOB 02/02/1993
2009 Maroon Jeep Wrangler
VIN - 1J4GA64189L768591
License Plate – CO Temp 6527986

The search shall include all containers both locked and unlocked.

16

# ATTACHMENT B
## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) Possession of a Controlled Substance with Intent to Distribute:

1. Controlled substances, including, but not limited to counterfeit trademarked prescription pills containing fentanyl and methamphetamine.

2. Drug paraphernalia, including devices used to ingest, inhale, or otherwise introduce controlled substances into a person's body.

3. Any vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such controlled substances.

4. Any substance used to mix into controlled substances in order to create a larger volume. Such substances are commonly referred to as "cut."

5. Books, receipts, notes, invoices, charge card and/or credit card statements and summaries, bank statements, records, correspondence, narcotics customer lists, growing schedules, logs, journals, contracts, shopping lists for food and supplies, letters, phone records, phone books, address books, notations and other papers, and any files relating to the cultivating, transporting, selling, storing, ordering, purchasing or distributing of controlled substances or establishing those who recently used or rode in the vehicle.

6. Indicia related to occupancy and or ownership of the vehicle or of items of evidence found therein.

7. Computers, cellular telephones and/or portable telephones, pagers, iPods, and similar electronic devices, including any electronic data stored or saved therein.

8. Photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or controlled substances.

9. Devices used to communicate with other individuals involved in the manufacture and distribution of controlled substance, including cellular telephones, radios, pagers, beepers and devices used to conduct counter surveillance against law enforcement, including scanners, surveillance cameras, night vision devices, FLIR devices, monitors, motion sensors and/or alarms, recording devices and/or receipts or literature describing the same.

10. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

11.     Trace evidence to include fingerprints and or DNA collection.


DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.